**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-2215, 21-2672, 21-2676
_____

UNITED STATES OF AMERICA

v.

SCOTT ROSKOVSKI,
             Appellant in Nos. 21-2215, 21-2672
STEPHANIE ROSKOVSKI,
             Appellant in No. 21-2676
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(Nos. 19-cr-00106-002 and 19-cr-00106-001)
District Judge:  Honorable William S. Stickman, IV
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 8, 2022

Before:  JORDAN, HARDIMAN, and SMITH, *Circuit Judges*

(Filed: September 9, 2022)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Scott and Stephanie Roskovski, a married couple, together defrauded a non-profit hospital system of more than $1.3 million to fund their lavish lifestyle. Despite the Roskovskis' best efforts, federal investigators across multiple agencies caught up with them. Faced with the government's evidence, they pled guilty to offenses related to the fraud and its aftermath. Scott, however, moved to withdraw his guilty plea on the eve of sentencing, and he now appeals the District Court's denial of that motion. Stephanie, meanwhile, appeals her restitution order. Because both of their appeals are barred by like-worded appellate waivers included in their plea agreements, we will affirm.

## I.    BACKGROUND

Scott worked for decades in law enforcement, first as a Sheriff's deputy in Butler County, Pennsylvania, and then as a fraud and financial crimes detective for the Butler County District Attorney's Office. Stephanie was a longtime employee of Butler Health System ("BHS"), a major employer and health care provider in the same county. She eventually worked her way up the ranks to Chief Operating Officer, a role in which she reported directly to the Chief Executive Officer. Scott and Stephanie also jointly owned and operated Switchback MX LLC, a motocross business that hosted races, concerts, and other events. Thus far, their story sounds like one of success, but, unfortunately, it does not end there.

Apparently dissatisfied with the wealth they had, the couple began treating BHS as their personal slush fund. While she was COO, Stephanie was entrusted with a corporate credit card, to which she charged more than $490,000 in personal expenses that she

disguised as business spending. She also collected more than $480,000 by submitting fraudulent reimbursement requests to BHS. Those funds either went into the Roskovskis' joint checking account or toward other personal ends, including covering the operating costs of Switchback. Finally, Stephanie fraudulently obtained more than $360,000 in checks from BHS to buy gift cards for supposed business purposes. Instead, the Roskovskis used the gift cards for personal purchases, like equipment for Switchback. Unsurprisingly, the couple did not report the proceeds of the embezzlement as income on their federal tax returns.

BHS did, however, eventually discover the Roskovskis' crimes, and, in August 2017, it fired Stephanie. About a year later, Scott was fired by the District Attorney's Office. The Roskovskis entered into a civil settlement agreement with BHS, in which they agreed to repay a portion of the embezzled funds.[1] Stephanie then started a new job with Highmark Healthcare in Pittsburgh, Pennsylvania as Vice President. But when Highmark learned of her fraudulent activities at BHS, it let her go.

Immediately after that, the Roskovskis submitted a loan application for more than a million dollars to a bank, seeking to refinance Switchback and certain other business expenses. Although Stephanie had been fired from Highmark, the application represented that she was still employed there and continued to earn well over six figures.

---

[1] The agreement provided that the Roskovskis and Switchback would jointly pay $200,000 to BHS. The Roskovskis would next pay BHS an additional $270,000. Stephanie had already repaid $71,364.33, prior to the execution of the agreement, making the Roskovskis liable for a total of $541,364.33 – significantly less than their total proceeds.

The application also failed to mention the Roskovskis' repayment obligations to BHS under their settlement. The bank granted the Roskovskis' application and extended a loan to Switchback as the borrower, with the Roskovskis as guarantors.

Unbeknownst to the Roskovskis, they were under investigation by the Federal Bureau of Investigation, the Internal Revenue Service, and the U.S. Postal Service, based on information provided by BHS. That investigation culminated in April 2019, when the Roskovskis were indicted on thirty-seven charges, with a forty-two-count superseding indictment filed the next month. The couple initially pleaded not guilty, but later entered into nearly simultaneous plea agreements. Stephanie pleaded guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341, and filing a false income tax return, in violation of 26 U.S.C. § 7206(1). As part of that agreement, she expressly waived her right to appeal her conviction or sentence. Scott pleaded guilty to one count of submitting a false statement in a loan application, in violation of 18 U.S.C. § 1014, and filing a false income tax return, in violation of 26 U.S.C. § 7206(1). At sentencing, he affirmed that "there [was] a factual basis for each and every one of the elements of the two crimes to which [he] agreed to plead guilty[.]" (J.A. at 127.) As part of his plea, Scott, too, waived his right to appeal.

About two weeks before his sentencing hearing, Scott twice unsuccessfully moved to withdraw his guilty plea. The District Court rejected both those efforts. The first time, it said it had "no doubt that [he] possessed a thorough understanding of his plea negotiations and the crimes to which he pled guilty." (Gov't Supp. App. at 16.) The second time, it concluded that his motion was "nothing more than a veiled

4

reconsideration motion," since "[h]is 'new' arguments merely put flesh on the bones of the old and ring hollow." (21-2215, 21-2672 App. at 7, 14.)

Turning to the issue of restitution, the District Court held a two-day hearing and credited the government's evidence that restitution payable to BHS should be set at $1,343,797.07.[2] Shortly after that, the Court held a sentencing hearing for both Scott and Stephanie. Scott was given two concurrent thirty-month sentences, while Stephanie was sentenced to concurrent sentences of fifty-one months and thirty-six months in prison. They each filed timely appeals, which we consolidated.

## II. DISCUSSION[3]

Scott and Stephanie both challenge aspects of the proceedings in the District Court, but we do not resolve their claims on the merits. Rather, we hold that their appeals fail because of their appellate waivers. The arguments they advance, focusing on the attempted withdrawal of Scott's guilty plea and the amount of the restitution order, are plainly foreclosed by those waivers.

We will enforce an appellate waiver in a plea agreement if we conclude "(1) that the issues he pursues on appeal fall within the scope of his appellate waiver and (2) that

_____

[2] The District Court applied a credit of $595,137.04 pursuant to the Roskovskis' civil settlement agreement with BHS, *supra* n.1, making the total balance due to BHS $748,660.03. It then issued a restitution order against Stephanie for $748,660.03 payable to BHS, and a restitution order against Scott and Stephanie, joint and severally, for $538,714.38, payable to the IRS.

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

he knowingly and voluntarily agreed to the appellate waiver," but (3) we will not do so if "enforcing the waiver would work a miscarriage of justice." *United States v. Corso,* 549 F.3d 921, 927 (3d Cir. 2008). To determine whether an appellate waiver would work a "miscarriage of justice," we consider "the clarity of the error, its gravity, its character, the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." *United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005).

Scott's appellate waiver broadly covered a "direct appeal from his conviction or sentence[.]" (J.A. at 85.) Since the efforts to withdraw his guilty plea were an overt attack on the conviction that resulted from the plea, Scott's appeal is covered by the waiver he entered. *See United States v. Leon*, 476 F.3d 829, 832 (10th Cir. 2007) ("[A]n appeal of a denial of a motion to withdraw a guilty plea is an attempt to contest a conviction on appeal and thus falls within the plain language of [an appeal] waiver provision.") (alteration in original); *United States v. Toth*, 668 F.3d 374, 378 (6th Cir. 2012) (same); *United States v. Perillo*, 897 F.3d 878, 882 (7th Cir. 2018) (same).

And that waiver was made knowingly. The District Court explained to Scott the nature of his waiver, stating: "I'm going to recite to you some of the waivers that you made in that agreement as to your appellate rights so I can assure myself that you understand the rights that you're giving up." (J.A. at 128.) Scott even conceded, in his first motion to withdraw, that he was warned of the consequences of the waiver. Moreover, Scott represented when pleading guilty that he "had an ample opportunity to

6

discuss" his case with his attorney. (J.A. at 95.) Scott was thus informed of, and agreed to, the waiver of his appellate rights.

Finally, Scott has not shown that enforcing his waiver would work a miscarriage of justice. As the District Court suggested, it strains belief to think that Scott, a man with a college education and years of experience as a fraud and financial crimes detective, did not understand the elements of the crimes he committed, the nature of the government's burden of proof, or the effect of the waiver he accepted. The District Court was also appropriately dismissive of Scott's claims of actual innocence, as he failed to submit any new and relevant evidence to show that he did not commit the charged offenses and because he repeatedly acknowledged his guilt at length during the plea process. *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant, his lawyer, and the prosecutor at … a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.").

Turning next to Stephanie, we are faced with her argument that the District Court's restitution order was based on flawed and unsupported factual findings. But she too – like her husband – "waive[d] the right to take a direct appeal from her conviction or sentence under 28 U.S.C. § 1291 or 18 U.S.C. § 3742." (No. 2:19-cr-106-1, D.I. 89-1 at 5-6.) We have held that "[b]y waiving his right to appeal his criminal sentence, [a defendant] waiv[es] his right to appeal the restitution order." *United States v. Perez*, 514 F.3d 296, 299 (3d Cir. 2007). That would seem to end the argument, but Stephanie attempts to distinguish *Perez*, saying that the defendant there stipulated to the restitution

7

amount and that his appellate waiver included a provision expressly preventing the appeal of stipulations. Because restitution was not expressly included in her appellate waiver, she believes it is outside the scope of her waiver. We disagree.

Our holding in *Perez* was not cabined in the way Stephanie claims. We deemed the restitution argument in that case waived because the restitution order was a 'component of [the defendant's] sentence[.]" *Id.* at 299; *see also United States v. Leahy*, 438 F.3d 328, 333-35 (3d Cir. 2006) (holding that restitution is a criminal, not civil, penalty). According to *Perez*, a waiver of any appeal pertaining to a sentence inherently includes a waiver of appeals pertaining to the restitution order that is part of the sentence. *Perez*, 514 F.3d at 298-99. In reaching that conclusion, we aligned ourselves with the Tenth, Fourth, and Sixth circuits, which treat appellate waivers as barring appeals of restitution orders. *Perez*, 514 F.3d at 299 & n.2

Stephanie, like Scott, participated in a thorough colloquy with the judge about the nature of the rights she was giving up when she chose to plead guilty, including her rights to appeal. She thus knowingly and voluntarily waived those rights. Moreover, given the "staggering amount of evidence" the District Court found supported its restitution order (J.A. at 712 n.6), it is obvious that enforcing Stephanie's waiver and leaving that order intact would not result in a miscarriage of justice.

III. CONCLUSION

For the foregoing reasons, we will affirm.

8